**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> DANIEL K. NODINE, ) <br> ) <br> Defendant. ) | Criminal Action <br> No. 05-05022-01-CR-SW-RED |

**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE**

Pursuant to 28 U.S.C. § 636(b), the above-styled criminal action was referred to the undersigned for preliminary review. This matter comes before the Court on defendant's Motion to Suppress Evidence. A hearing was held before the undersigned on September 23, 2005. Defendant was represented by David Mercer, Assistant Federal Public Defender, and the government was represented by Angela Hasty, Special Assistant United States Attorney.

This case involves the search and seizure of a residence in which items belonging to defendant were seized. Defendant moves the Court to suppress all evidence taken from the search and seizure.

Defendant contends that the search warrant lacked probable cause, and that the good faith exception does not apply because the magistrate was not neutral and detached.

The government first called Detective Adam Crouch, a narcotics investigator for the Barry County Sheriff's Department. According to the testimony of Detective Crouch, he was working on May 17, 2005. He received a telephone call from a dispatcher regarding possible narcotics being

1

found at a convenience store in Purdy, Missouri.  Deputy Angela Cole had made the call and she briefed Detective Crouch regarding what was found.  Deputy Cole got the information from an individual who had found the suspected narcotics.  Detective Crouch then went to the Gas-N-Grub and talked to the clerk, Barbara Gardner.  She had not noticed anything being dropped.  The officer then observed surveillance cameras in the store.  If asked her if she had access to the surveillance videotape.  Ms. Gardner advised him that she would have to call the store owner, Troy Collins.  She did so, and Mr. Collins arrived at the scene.  Detective Crouch told him about the situation, and asked if they could view the surveillance tape.  He viewed it just long enough to get a time frame, and then took it into his custody.  He took the tape to the Cassville Police Department to view with the proper time-lapse equipment.  The officer testified that, at the time he viewed the tape, what could be seen on the tape was clear.  When he took it to the police department, his intention was to view the tape from the point when Mr. McIntire, the person who found the suspected narcotics, picked the package up, and then go backwards until the point where the package was not visible on the surveillance tape.  Detective Crouch stated that he knew defendant prior to this.  Through two different views, one from the back and one side angle, he recognized defendant and saw the drugs being dropped.  The machine at the police department was black and white, so he took the tape back to the Gas-N-Grub where there was a color monitor.  He decided to play it there and ask the individuals at the store if they could recognize who the person was.  Troy Collins, Barbara Gardner, and Teddy McIntire identified defendant on their own, with no help from the officer.  Barbara Gardner recognized him first.  He asked these individuals how they knew it was defendant, and they said he was a regular customer, they knew his hair style, how he dressed, and his facial expressions and features.

Detective Crouch then went to the Barry County Sheriff's Department and applied for a search warrant. He included defendant's address, stated that he was familiar with the residence because of a prior arrest there, that he was aware of defendant's prior history of methamphetamine involvement, and that he knew that, typically, people who are involved in the distribution of methamphetamine often use the drug. Detective Crouch testified that he did not make any false statements in the affidavit. He believed that he could accurately identify defendant from the videotape, and he believed the witnesses at the store who viewed it were telling the truth. When he was viewing the videotape at the convenience store, Troy Collins was able to pause, zoom, and use the panoramic aspect of the camera to enhance the ability to identify the individual on the tape. The officer identified defendant in the courtroom.

On cross examination, Detective Crouch testified that he was familiar with the residence because of a prior arrest. He stated that he did not recall the exact date when this occurred, but then remembered that it was September of 2003. He did not recall if he had any more contact with defendant between that time and May of 2005. Either on the evening of the 17th of May or the morning of the 18th, he did drive by and identify one of the vehicles at the residence as being defendant's. He confirmed that the vehicle was registered to defendant, but he did not include this in the affidavit. He did not remember when he had last seen defendant drive this vehicle. The officer conducted no investigation otherwise.

In the affidavit, Detective Crouch included his general opinion regarding residences containing controlled substances, but he did not have any specific facts that defendant's residence was likely to contain chemicals, precursors, glassware, marijuana or paraphernalia. He did have specific facts that distribution equipment might be found there because the several small bags found

3

at the convenience store were consistent with someone who was distributing methamphetamine. When he drafted the affidavit, he had no specific facts regarding when defendant was last in the house. He just saw his truck there. He didn't know whether he had been there that day before he was at the convenience store. The officer testified that he knew defendant lived at the residence at the time of the search warrant because his vehicles were there, and there was a shed and an old truck out back that had been there the last time he was there. Through his training and experience, he knew that individuals that deal in controlled substances often have them at their residence. He agreed that the information contained in the affidavit occurred on May 17th. He had the three individuals at the store review the tape on the morning of the 18th. He drafted the affidavit, obtained the search warrant, and executed it on the 18th.

On the videotape, the officer looked for Teddy McIntire as the beginning point, and then went back in time. They never saw the individual from the front, but did see him from a side view. Detective Crouch agreed that the person was wearing a ball cap that partially extended over his face. The officer wasn't sure if other persons came in during the relevant time period, but he didn't think they would have obscured the view of the drugs if they were standing at the front counter. He also agreed that the methamphetamine appeared not to have been manufactured locally. He disagreed that this would not be consistent with chemicals, glassware, or precursors, being at the residence.

On redirect examination, Detective Crouch stated that the methamphetamine was packaged in a manner consistent with drug dealing. "It was packaged in a large bag containing several small bags containing close proximity quantities." [Tr. 28]. He also stated that the judge signed the warrant and he executed it in good faith because the judge had signed it. He stated that defendant was at the residence when they executed the warrant.

4

On recross examination, Detective Crouch clarified that, on the surveillance tape, he did not actually see an individual drop the package. Rather, he saw a hand go into a pocket, come out of the pocket, the person stepping away, and then a package was on the ground, which was not there before. Regarding the residence, he did not check to see who owned it, leased it, or who paid the utility bills. He just knew that defendant lived there from prior reports and arrests.

The next witness for the government was Troy Collins, who owns the Gas-N-Grub. He has a security system in the store, with three cameras in different locations. He stated that he was contacted by the police on May 17th, 2005. They told him that someone had recovered a package found on the floor, and asked about a surveillance camera. The next day, they called him at home. He went to his store with Mr. McIntyre and Ms. Gardner, and they watched the tape. They zoomed in at different camera angles, and he identified defendant because he's a regular customer, and he was certain it was him. The officer did not tell him who he thought it was before he made his identification.

On cross examination, Mr. Collins testified that he could see the package after it was on the floor, but he did not actually see defendant drop it. He didn't remember when he reviewed the tape the second time; it could have been the next day, or it could have been two or three days later.

The government next called Barbara Gardner, who works at the Gas-N-Grub. She was working on the day in question. The police showed up because they found something on the floor, and asked if they had surveillance cameras. She called Mr. Collins, and then the officers took the tape. She was later contacted again by the police, who wanted them to verify who was on the tape. They viewed it at the convenience store with Detective Crouch. When she watched it, she did not know who she was looking for. She was asked to identify the individual, and she identified

5

defendant. He's a regular customer, and she's certain it was him.

On cross examination, she agreed that she didn't see anything being dropped directly, but she said she saw it on the camera. She stated that it was right after defendant left that Mr. McIntire picked up the package, estimating that it was two, three, or four minutes. No other customers had come in during that time period.

The government proffered that Mr. McIntire's testimony would be the same regarding identifying defendant on the tape and being sure it was him.

Defendant called Angela Collins, Troy's wife. She remembered that her husband was called to retrieve a videotape, and thinks it might have been the 17th of May. She's not exactly sure when he was called back. It's possible it was the next day, but she cannot say a definite date. It could have been the 18th or the 19th. She acknowledged that during the interview with the investigator, she felt strongly enough about the fact that it was not the next day that she corrected her husband and said it was at least several days later.

After the suppression hearing in this case, defendant filed a Supplemental Motion to Suppress Evidence and Request for a Franks Hearing.

In Franks v. Delaware, 438 U.S. 154, 155-56 (1978), the Supreme Court held that the Fourth Amendment entitles a defendant to an evidentiary hearing about the veracity of a search warrant affidavit if the defendant can make "a substantial preliminary showing" that the affiant intentionally or recklessly included a false statement in the affidavit. See also United States v. Mathison, 157 F.3d 541, 547- 48 (8th Cir.1998). To warrant a Franks hearing, the allegedly false statement must be "necessary to the finding of probable cause." Franks, 438 U.S. at 156, 98 S.Ct. 2674; United States v. Gleich, 397 F.3d 608, 613 (8th Cir.2005). In support of his motion for an evidentiary

6

hearing, defendant asserts that a review of the surveillance tapes provided by the government shows two Franks violations. Because of the overall poor quality of the tapes, it is impossible to support Detective Crouch's statement regarding seeing the subject reach in his left front pocket, remove his hand from his pocket, and see an item then laying on the floor next to his left foot. Therefore, he contends that the officer's statements were, at a minimum, recklessly made. Secondly, he asserts that the officer's statements that the owner of the store and the clerk identified defendant were recklessly made. Accordingly, defendant seeks suppression of all evidence, including statements he made.

Having carefully reviewed the testimony adduced at the hearing, the Court finds that defendant has failed to make the substantial preliminary showing required by Franks. It cannot be said that the statements about which he complains were recklessly or falsely made. The testimony of all the witnesses regarding their ability to identify defendant on the surveillance tape was clear. They each stated that they were sure it was defendant because they knew him and recognized him. In the case of the officer, he had dealt with defendant on several prior occasions. He narrowed down the time frame, and then "started breaking down the segments of the tape." [Tr. 8]. He looked at the tape from the back and side angle, and determined it was defendant. He stated that he saw a hand go into a pocket, come out of the pocket, the person step away, and then a package was on the ground, which was not there before. The officer then took the tape back to the Gas-N-Grub and asked the clerk, the owner, and the person who found the package on the floor if they recognized the person in the video. He testified under oath that he did not make any statements prior to their identifications regarding who the person was. He believed that Ms. Gardner, the clerk, first identified defendant, shouting out, "That's Daniel Nodine." [Tr. 10]. The officer testified that he

7

asked them how they knew who it was, and they told him defendant was a regular customer, they knew his hairstyle at the time, knew how he dressed, and knew his facial expressions and features. It was also Detective Crouch's testimony that when they viewed the tape, there were special mechanisms at the store that allowed them to have a better view of it. These included the ability to pause, zoom, and panoramic the camera to obtain a better identification. He agreed that he could see the person pretty clearly, and then identified defendant in the courtroom.

The testimony of Mr. Collins and Ms. Gardner, as well as the proffer regarding Mr. McIntire's testimony, are entirely consistent with the testimony provided by Detective Crouch. Mr. Collins stated that they zoomed in on the tape, and that it was "pretty clear." [Tr. 34]. He could see defendant "walk by the side and around the front, and I mean, you could see it was him." [Id]. Mr. Collins said he knew it was defendant because he had been a regular customer since he had owned the store. He was absolutely certain that it was defendant on the video. Mr. Collins also stated that the detective did not tell him who was on the video. The witness agreed that he did not see the package actually come out of defendant's pocket, but he could see "where it was before he was there and after he was there." [Tr. 35]. Ms. Gardner testified that when she watched the tape, she did not know who she was looking for, and no officer had made any statement regarding who the individual was. She saw someone put their hand in their pocket, pull it out, and then there was methamphetamine on the floor. Ms. Gardner said the individual was defendant, whom she knew because he was a regular customer. She was absolutely sure it was him. She testified further that Mr. McIntire handed her the package right after defendant left, or within two to four minutes. It was also Ms. Gardner's testimony that no other customers came into the store during that time period. The government proferred that Mr. McIntire would

8

testify that he was absolutely certain that it was defendant on the surveillance video.

A thorough review of the testimony in this case satisfies that Court that defendant has failed to make the substantial preliminary showing required by <u>Franks.</u>  There was convincing, credible testimony adduced at the hearing regarding the certainty of the identification of defendant by the officer and three independent individuals.  Further,  all three of the live witnesses who testified stated that they saw, at a minimum, a package on the floor after defendant was there that was not there before he was at the counter.  The officer and Ms. Gardner both saw a hand go into a pocket, come out, and then the drugs on the floor.  It was established by the witnesses, moreover, that various features on the surveillance equipment were used to zoom and pause the tape in order to better discern what could be seen.   Because there is no evidence to support defendant's claim that the statements about which he complains were recklessly or falsely made, his request for a <u>Franks</u> hearing will be denied.   Further, based on the foregoing, the Court does not believe it is necessary to review the surveillance tape.

Additionally, the Court finds that there was probable cause to believe that evidence of illegal drug activity might be found at defendant's residence.  The information included in the affidavit in support of the search warrant regarding what was seen on the surveillance tape is consistent with the testimony adduced at the hearing.  Further, the office stated that based on his knowledge and experience, the packaging of the methamphetamine was consistent with distribution of that drug.  He included his belief that the methamphetamine itself was not consistent with methamphetamine that is manufactured locally, but rather,  that it was consistent with methamphetamine that was brought in from out of the area.  He expressed his belief that distributors of methamphetamine commonly keep large quantities of it in their residence,

together with scales, packaging material, and drug paraphernalia for personal use. Detective Crouch also included the information that an investigation had been conducted at defendant's residence on September 27, 2003, during which "numerous items of drug related paraphernalia and 5 stolen guns were recovered from the residence. [Defendant] is currently on probation for possession of a controlled substance." [Affidavit, 2].

The law is clear that a warrant is supported by probable cause if, "given all the circumstances set forth in the affidavit . . ., including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that contraband or evidence of a crime will be found in the place to be searched. United States v. Edmiston, 46 F.3d 786, 789 (8th Cir. 1995), quoting Illinois v. Gates, 462 U.S. 213, 238 (1983). Affidavits should be read in a "common-sense and realistic fashion" and judges must make a practical decision based on the totality of the circumstances. United States v. Gladney, 48 F.3d 309, 312 (8th Cir. 1995) (citation omitted). In determining for suppression purposes the validity of a warrant, the court must determine whether there was a "substantial basis" for the probable cause determination. Gates, 462 U.S. at 238. "When we review the sufficiency of an affidavit supporting a search warrant, great deference is accorded the issuing judicial officer." U.S. v. Fulgham, 143 F.3d 399, 400-01 (8th Cir. 1998) (citation omitted).

After a full review of the affidavit in support of the application for the search warrant, the Court finds that, based on the totality of the circumstances, probable cause existed to support the issuance of the warrant. The occurrence at the Gas-N-Grub took place the day before the search warrant was sought. Four individuals, three of them private citizens, identified defendant as the individual on the tape, which showed a package of methamphetamine on the floor of the

convenience store in a location where defendant had been minutes previously. The witnesses testified that they either saw a hand go into a pocket, come back out, and then observed a package on the ground, or they saw the package on the ground after defendant had been there. The affiant, Detective Crouch, knew defendant's criminal history, knew that he had been in possession of drug paraphernalia and firearms during an investigation in September of 2003, and knew the vehicles he drove. He confirmed that at least one of the vehicles at defendant's residence on the night of the 17th or morning of the 18th was registered to defendant, and the officer was familiar with the residence itself. Although these last two pieces of information were not included in the affidavit, Detective Crouch testified about this information at the hearing. Therefore, it is clear that he did some corroboration to ensure that defendant was living at the residence before he sought the search warrant. Based on the totality of the circumstances, the Court is convinced that probable cause existed to support the issuance of the search warrant in this case.

Even if that were not the case, however, the Court is of the opinion that the good faith exception enunciated in United States v. Leon, 468 U.S. 897, 922-23 (1984), would apply. When making a good faith assessment, the Court must examine the totality of the circumstances, including what the officer knew but did not include in his affidavit. United States v. Chambers, 987 F.2d 1331, 1335 (8th Cir. 1993). Having reviewed the record as a whole, it is clear that the officer reasonably relied on the validity of the warrant. A careful review of the evidence establishes that the officer had an objective, good faith belief that the warrant was valid and based upon probable cause. Accordingly, it will be recommended that the motion to suppress the evidence seized as a result of the search warrant issued on May 18, 2005, should be denied.

11

Having fully reviewed the record in this case, the Court finds that the search warrant was based on probable cause, and that defendant did not suffer a violation of the Fourth Amendment. Accordingly, the Court finds that defendant's motion to suppress evidence must be denied.

For the foregoing reasons, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

RECOMMENDED that defendant's motion to suppress evidence should be denied.

/s/ James C. England  
JAMES C. ENGLAND  
United States Magistrate

Date: 10/11/05